UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| RANDY BALL,<br><br>Plaintiff,<br><br>vs.<br><br>FEDERAL INSURANCE COMPANY,<br><br>Defendant. | 4:18-CV-04008-KES<br><br>ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

Plaintiff, Randy Ball, brought a lawsuit against defendant, Federal Insurance Company, alleging that Federal acted in bad faith when it denied Ball's workers' compensation claim. Docket 1. Federal moves for summary judgment. Docket 62. Federal argues that it is entitled to judgment as a matter of law because its decision to terminate coverage in September 2014 was debatable. Docket 63 at 2. Ball opposes Federal's motion and disputes several of Federal's statements of fact. Dockets 66, 67. For the following reasons, the court denies Federal's motion for summary judgment.

## BACKGROUND

The facts, viewed in the light most favorable to Ball, the non-moving party, are as follows:

On June 21, 2013, Ball was working as a swine technician at a hog confinement facility in Willow Lake, South Dakota. Docket 67 ¶ 1. EMP Serv LLC owned the facility. *Id.* ¶ 2. While making his usual rounds in the barn, Ball

saw a tornado coming toward him and ran down the hallway. *Id.* ¶ 3. Ball tried to open a door to an office, but he was knocked backward and hit his head on a sink. *Id.* ¶ 4. Ball was unconscious for a period of time and then drove home. *Id.* ¶ 5. Ball did not seek medical attention on June 21, 2013. *Id.* ¶ 6.

Three days later, Ball was evaluated by his regular medical provider, Judi Anderson, a Certified Nurse Practitioner (CNP), at the Sanford Clinic in Lake Norden, South Dakota. *Id.* ¶ 7. Ball exhibited dizziness, nausea, and fatigue, and he was diagnosed with a concussion. *Id.* ¶ 8. A CT scan of Ball's head indicated a normal result. *Id.* ¶¶ 9-10. On June 27, 2013, the Lake Norden clinic entered an order referring Ball to the Sanford Neurology Clinic. *Id.* ¶ 11. The parties dispute whether CNP Anderson ordered Ball to remain off work until July 1 or July 23. *Id.* ¶ 12. On July 9, Ball returned to see CNP Anderson. *Id.* ¶ 16. At that time, Ball was scheduled to see a neurologist in September. *Id.* ¶ 17.

Federal was EMP's workers' compensation insurance carrier at the time of Ball's injury in June 2013. *Id.* ¶ 14. Federal initially accepted Ball's claim as compensable and assigned a claims examiner, Harold White, and a nurse case manager, Brenda Whiting, to assist Ball in obtaining any recommended medical care. *Id.* ¶ 15. In order to understand Ball's likely treatment path, White contacted Integrity, a third-party vendor, and requested that a neurologist examine Ball. *Id.* ¶¶ 18-19. But Integrity informed White that it could not provide a neurologist to perform an Independent Medical Evaluation (IME) at that time. *Id.* ¶ 20; *see also* Docket 66 at 2 (clarifying that IME stands

2

for Independent Medical Evaluation). White instead chose Dr. Thomas Jetzer, an occupational medicine specialist, to conduct an IME of Ball. Docket 67 ¶ 21.

Dr. Jetzer performed his first of three evaluations of Ball on August 17, 2013. *Id.* ¶¶ 22, 47, 80. Following the first evaluation, Dr. Jetzer's report indicated that Ball sustained a closed head injury and may have suffered a concussion. *Id.* ¶ 25. The report noted that Ball did not appear dizzy during the exam, though Ball indicated to Dr. Jetzer that he continued to experience dizziness since the June 23 incident. *Id.* ¶ 26; Docket 34-1 at 1-2. Dr. Jetzer's report stated that Ball had not yet had an MRI, an Eye, Nose, and Throat (ENT) consult, vestibular balance testing, or cognitive testing. Docket 67 ¶ 27. Dr. Jetzer concluded that, at that time, he was unable to determine whether Ball had any significant ongoing pathology. *Id.* ¶ 28. Dr. Jetzer believed that Ball should not return to work until additional testing and determinations were made. *Id.* ¶ 28; Docket 34-1 at 5. Dr. Jetzer recommended further testing including an ENT evaluation, a neurological evaluation, and neurocognitive testing. Docket 67 ¶ 29.

On September 9, 2013, Ball was examined by Dr. Eugenio Matos, a neurologist, at the Sanford Neurology Clinic. *Id.* ¶ 30. Dr. Matos noted that Ball was unsteady during the examination, and he concluded that Ball had sustained a closed head injury with possible post-concussion symptoms. *Id.* ¶¶ 31, 33. Dr. Matos' examination did not indicate a brain stem stroke or other abnormal neurological findings. *Id.* ¶ 32. Dr. Matos ordered Ball to undergo physical therapy with vestibular exercises and ordered a follow-up appointment

3

in one month. *Id.* ¶ 34. Ball began physical therapy as ordered by Dr. Matos, but therapy was temporarily stopped until Ball's elevated blood pressure could be controlled. *Id.* ¶¶ 35-36. Ball's follow-up appointment with Dr. Matos in October 2013 found unsteadiness and persistent dizziness. *Id.* ¶ 38. During this appointment, Dr. Matos ordered MRI and MRA scans of Ball's brain. *Id.* ¶ 39.

An MRI taken on December 6, 2013, was negative for any abnormalities that could explain his symptoms. *Id.* ¶¶ 40-41. An MRA exam on December 20, 2013, showed a "tapering vessel extending into the base of the vertebral artery." *Id.* ¶¶ 45-46. Dr. Matos reviewed Ball's MRA results on December 24, 2013, and ordered an additional MRA of Ball's neck vessels. *Id.* ¶¶ 52-53. The additional MRA test showed an "attenuated and irregular small left vertebral artery" which could indicate a "congenital variant or perhaps a previously thrombosed and re-opened vessel." *Id.* ¶¶ 55-56. Dr. Matos concurred with these findings, and he indicated to Ball that he did not believe the findings were the source of Ball's problems. *Id.* ¶¶ 58, 61. Dr. Matos recommended that Ball work with an ENT physician. *Id.* ¶ 62.

In December 2013, Ball saw Dr. Gregory DeSautel, an ENT. *Id.* ¶ 42; Docket 65-1 at 9. Dr. DeSautel found that Ball suffered from dizziness secondary to head trauma and anxiety. *Id.* ¶ 43. Dr. DeSautel recommended Xanax to alleviate Ball's symptoms. *Id.* ¶ 44.

On December 20, 2013, Ball was examined by Dr. Jetzer for a second time. *Id.* ¶ 47. Since Ball's initial exam with Dr. Jetzer, he had been evaluated

4

by a neurologist (Dr. Matos), an ENT specialist (Dr. DeSautel), and had undergone additional diagnostic testing in the form of a brain MRI and brain MRA. *Id.* ¶ 48. Dr. Jetzer reviewed the updated treatment records from Dr. Matos as well as the new diagnostic studies. *Id.* ¶ 49. In a report following his second evaluation of Ball, Dr. Jetzer refrained from offering a definitive opinion on Ball's impairment, and he believed that further testing and evaluation by a neurologist or a neurosurgeon were warranted. *Id.* ¶¶ 50-51; Docket 34-2 at 5. In that same report, Dr. Jetzer found that "Ball has not yet reached maximum medical improvement" and "there are still questions that need to be answered that are beyond the scope of this independent medical examination." Docket 34-2 at 5.

On January 31, 2014, Federal adjuster White sent an email to Nurse Whiting and others about an upcoming phone conference related to Ball's case. Docket 67 ¶ 64. The email stated that, in preparation for the upcoming phone conference, White wanted Nurse Whiting to "think about a couple of [traumatic brain injury (TBI)] programs as an option for [] Ball preferably [South Dakota] outpatient or inpatient program[s] in [Minnesota]" in case Ball's condition did not improve after seeing an ENT doctor. *Id.* ¶ 65. Nurse Whiting provided Adjuster White with information about a TBI program in Omaha, Nebraska, called the QLI Difference. *Id.* ¶ 66. An internal Federal document created around January 2014 notes that it "[w]ill need to approach [Ball's] counsel with suggestion of TBI program in [Nebraska]." Docket 34-6 at 2. Ball and Federal dispute whether Ball was diagnosed with a TBI and whether Federal

5

terminated coverage before a TBI could be diagnosed. *See* Docket 66 at 4; Docket 67 ¶ 67.

In February 2014, Ball returned to his ENT doctor, Dr. DeSautel, at the recommendation of his neurologist, Dr. Matos. Docket 67 ¶ 68. Dr. DeSautel recommended a different anxiety medication and additional physical therapy. *Id.* ¶ 69. Dr. DeSautel re-evaluated Ball after several weeks of physical therapy. *Id.* ¶ 70. As of March 20, 2014, Dr. DeSautel noted that Ball had made some progress with physical therapy and his balance was slowly improving. *Id.* ¶ 71. Dr. DeSautel ordered an additional 10 weeks of physical therapy and then another follow-up appointment. *Id.* ¶ 72.

Federal avers that in May 2014 Ball also underwent a neuropsychological evaluation conducted by Dr. Michael McGrath.[1] Docket 34-3 at 3; Docket 67 ¶¶ 73-76. Federal selected Dr. McGrath and made Ball's appointment with him. Docket 69-1 at 12. According to Dr. McGrath, Ball's responses to the neuropsychological testing suggested that he was not making a sincere effort in his recovery. *Id.* ¶ 74. Dr. McGrath's report indicated that Ball "performed in a manner suggestive of inadequate effort on 4 of 5 validity indicators." *Id.* ¶ 75.

---

[1] Ball denies all of Federal's assertions related to Dr. McGrath and responds that "[t]here is no evidence that a full neuropsychological exam or report was completed by McGrath." Docket 67 ¶¶ 73-76. But Ball fails to identify anything in the record that directly refutes or even calls into question whether Dr. McGrath evaluated Ball. *See id; see also* D.S.D. Civ. LR 56.1.B ("A party opposing a motion for summary judgment must respond to each numbered paragraph in the moving party's statement of material facts with a separately numbered response *and appropriate citations to the record.*" (emphasis added)). Thus, the court includes Federal's averment but notes Ball's denial, albeit without citing contrary facts in the record.

Dr. McGrath concluded that Ball's test scores could not be confidently interpreted due to "probable malingering." *Id.* ¶ 76.

On June 11, 2014, Ball returned to ENT physician Dr. DeSautel. *Id.* ¶ 77. Dr. DeSautel noted that physical therapy had been helpful to Ball and that his agitation and anxiety had improved. *Id.* ¶ 78. Dr. DeSautel approved Ball to return to work in a structured environment and to continue with physical therapy. *Id.* ¶ 79.

Ball saw Dr. Jetzer for a third examination on September 13, 2014. *Id.* ¶ 80. During this exam, Ball refused to lie down when asked, though Ball alleges this was because lying down caused dizziness and vertigo. *Id.* ¶ 81. Ball told Dr. Jetzer that he still felt dizzy, was unable to look at the floor, passed out when he was flat on his back, had trouble bending forward, and had occasional headaches. Docket 34-3 at 2. Ball held onto the wall during one of the walking exams conducted by Dr. Jetzer. *Id.* at 3. In his final report, Dr. Jetzer stated that "[Ball] may have suffered a concussion and subsequent dizziness for a period of time[,]" but "[t]here appears to be . . . no evidence to support any residual pathology considering his clinical presentation." Docket 65-6 at 16. Dr. Jetzer's third and final report relied in part on Dr. McGrath's findings. Docket 34-3 at 3. Dr. Jetzer sent his final report to Federal on September 23, 2014. *Id.* at 1.

On September 30, 2014, Federal sent a letter to Ball's attorney stating that it would deny all treatment after the date of the letter. Docket 67 ¶ 95. Ball sought additional workers' compensation benefits through the South Dakota

Department of Labor. *Id.* ¶ 96. Federal and Ball settled his workers' compensation claim in November 2017. *Id.* ¶ 99. Ball brought this suit in January 2018 alleging that Federal acted in bad faith when it "knew that there was no legitimate and reasonable basis to deny [his] claim[.]" *Id.* ¶ 100 (second alteration in original); *see also* Docket 1. Federal moved for summary judgment on September 30, 2020, and Ball opposes the motion. Dockets 62, 66.

### LEGAL STANDARD

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet its burden by presenting evidence that there is no dispute of material fact or that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party must inform the court of the basis for its motion and also identify the portions of the record that show there is no genuine issue in dispute. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted).

To avoid summary judgment, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). Summary judgment is precluded if there is a genuine dispute of fact that could affect the outcome of the case.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When considering a summary judgment motion, the court views the facts and the inferences drawn from such facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

"It is . . . well-settled that in a suit based on diversity of citizenship jurisdiction the federal courts apply federal law as to matters of procedure but the substantive law of the relevant state." *Hiatt v. Mazda Motor Corp.*, 75 F.3d 1252, 1255 (8th Cir. 1996) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Here, South Dakota law governs substantive issues.

## DISCUSSION

An employee aggrieved by an insurer's bad faith failure to pay benefits to which the employee is entitled under the workers' compensation statute may proceed against the insurer by way of an action in tort. *Hollman v. Liberty Mut. Ins. Co.*, 712 F.2d 1259, 1261 (8th Cir. 1983). "An action for bad faith compensates an insured for the intentional misconduct of a defendant insurer as distinguished from merely negligent conduct." *Jordan v. Union Ins. Co.*, 771 F. Supp. 1031, 1033 (D.S.D. 1991) (citing *Simkins v. Great W. Cas. Co.*, 831 F.2d 792, 793 (8th Cir. 1987)). A two-part test establishes a bad faith denial of workers' compensation benefits under South Dakota law: "(1) [t]here was an absence of a reasonable basis for denial of policy benefits; and (2) [t]he insurer knew or recklessly disregarded the lack of a reasonable basis for denial."

9

*Johnson v. United Parcel Serv., Inc.*, 946 N.W.2d 1, 9 (S.D. 2020) (citing *Hein v. Acuity*, 731 N.W.2d 231, 236 (S.D. 2007)).

A workers' compensation insurer is permitted to " 'challenge claims which are fairly debatable,' and therefore, 'will be found liable only where it has intentionally denied (or failed to process or pay) a claim without a reasonable basis.' " *Hein*, 731 N.W.2d at 236 (quoting *Champion v. U.S. Fid. & Guar. Co.*, 399 N.W.2d 320, 324 (S.D. 1987)). A claim that is "fairly debatable either in fact or law" does not establish bad faith. *Johnson*, 946 N.W.2d at 10 (quoting *Dakota, Minn. & E. R.R. Corp. v. Acuity*, 771 N.W.2d 623, 630 (S.D. 2009)). "The focus is on the existence of a debatable issue, not on which party was correct." *Id.* (citation omitted). Whether an insurer acted in bad faith "is determined based upon the facts and law available to [the] [i]nsurer at the time it made the decision to deny coverage." *Acuity*, 771 N.W.2d at 629 (S.D. 2009) (quoting *Walz v. Fireman's Fund Ins. Co.*, 556 N.W.2d 68, 70 (S.D. 1996)).

**I. Absence of Reasonable Basis**

Federal argues that it is entitled to summary judgment because its decision to terminate Ball's coverage was fairly debatable. Docket 63 at 2. Federal states its view of Ball's claim as follows: "[Ball] claims that Federal committed bad faith because its adjusters did not demand from [Ball]'s treating physicians that [Ball] be referred for treatment to a special rehabilitation facility for traumatic brain injury [] patients." *Id.* at 1. In support of its summary judgment motion, Federal emphasizes three allegedly undisputed facts: "(1) Federal . . . had no authority . . . to order or direct specific medical

10

care for [Ball]; (2) none of [Ball]'s treating physicians ever diagnosed him with a TBI or recommended that he obtain treatment from a TBI rehabilitation facility; and (3) Federal never denied any medical care actually ordered by [Ball]'s medical providers . . . ." *Id.* at 1-2 (emphasis omitted).

Federal states Ball's claim too narrowly by focusing only on the absence of TBI treatment. Ball's claim is that Federal acted in bad faith when it terminated workers compensation coverage in September 2014 without a full investigation leading to a complete diagnosis. Docket 65-10 at 3-4; Docket 66 at 7. According to Ball, Federal's denial of coverage in September 2014 prevented further investigation, diagnosis, and treatment including, *but not limited to*, a referral to a TBI specialist. Docket 65-10 at 3-4; *see also* Docket 66 at 7. Thus, the court analyzes whether Federal is entitled to summary judgment based on Federal's denial of coverage in September 2014.

Federal relies on *Petrillo v. Lumbermens Mutual Casualty Co.* to support its argument that a workers' compensation insurer has no duty to direct an insured employee's course of medical treatment. 378 F.3d 767, 769 (8th Cir. 2004); Docket 63 at 18-19. In *Petrillo*, an employee who slipped and fell was sent by her employer to a physical therapist who treated her hip pain for two months and then discharged her. *Id.* at 768. The insurer, Lumbermens, paid for the two months of physical therapy and then closed the file. *Id.* Lumbermens reopened the file when her pain returned and her employer sent her back to a physical therapist and then a physician who diagnosed a broken hip. *Id.* When an orthopedic surgeon concluded that Petrillo's hip pain was

11

related to a childhood condition, Lumbermens again terminated benefits. *Id.*
When an IME later determined that Petrillo's underlying condition was
aggravated by her work-place injury, Lumbermens reinstated benefits and
retroactively paid for treatment including three hip replacements and an
implanted spinal stimulator. *Id.* After Petrillo brought suit against Lumbermens
alleging bad faith, a jury found for Lumbermans. *Id.*

On appeal, Petrillo argued that the jury should have been instructed that
Lumbermans had a duty not only to "pay for reasonable and necessary medical
care," as it was instructed by the trial court, but also to "furnish" care. *Id.* at
768-69. Petrillo alleged that Lumbermens' duty to "furnish" necessary care
included a duty to send her to a physician, and not a physical therapist, at the
outset of her injury. *Id.* at 769. Petrillo argued that Lumbermens' failure to do
so exacerbated her injury. *Id.* The Eighth Circuit Court of Appeals disagreed
with Petrillo and held that an employee cannot bring a claim against an insurer
where the employer exercises its duty under Iowa law to "furnish reasonable
services" and "choose the care." *Id.* at 770. Because Petrillo's employer had
exercised that duty, the insurer had no duty to step in and overrule the
employer's choice of care. *Id.*

*Petrillo* is inapposite to Ball's case and thus unhelpful to Federal for
several reasons. First, Petrillo argued that her insurer had a duty to direct her
care whereas Ball argues that care was terminated before his pathology was
actually determined and his injuries had been fully addressed. Second, the
posture of the two cases raises vastly different questions. Here, the threshold

question is whether there is a dispute of fact as to the reasonableness of Federal's denial of benefits. In *Petrillo*, the issue before the Court was the scope of the insurer's legal duty to direct medical care. Third, Iowa employers have a duty to direct the care of employees seeking workers' compensation, whereas it is the employee who chooses his or her own care under South Dakota law. Docket 63 at 20; *compare* SDCL § 62-4-1 *with* Iowa Code § 85.27(4). Federal acknowledges this distinction and argues that *Petrillo* is relevant because an employee's duty to select his or her own care further attenuates the role of the insurer in South Dakota. Docket 63 at 20. Because the dispute here is not over who had a duty to direct Ball's medical care, this distinction between Iowa and South Dakota law is not helpful to the court's analysis. Overall, Federal's reliance on *Petrillo* is misplaced because it incorrectly assumes that the issue in Ball's case is limited to the absence of TBI treatment instead of the denial of all coverage as of September 2014.

A jury could find that Federal had no reasonable basis for denying coverage on Ball's claim. While Federal claims that a TBI was never diagnosed, Ball points to facts that indicate coverage was terminated without a reasonable basis before such a diagnosis could be reached. Dr. Matos found that a brain stem injury was possible given Ball's symptoms. Docket 69-5 at 12. Although Ball was evaluated by a neurologist, Ball was never evaluated by a neurosurgeon, as suggested by Dr. Jetzer, or by a neurologist specializing in closed head injuries. Docket 34-2 at 5; *see* Docket 69-5 at 10. And Dr. McGrath concluded that the invalid data in Ball's tests "does not necessarily

imply that he did not suffer a [TBI]." Docket 69-6 at 7. During his time as Federal's adjuster on the case, Harold White never saw what he would consider a "final diagnosis," and the record is void of any such diagnosis after White quit working on the case in 2014. Docket 54-1 at 9, 22. Despite no clear diagnosis and persisting symptoms of dizziness, Federal seems to rely almost entirely on Dr. McGrath's conclusion of "probable malingering" to deny any ongoing coverage. Viewing the facts in the light most favorable to Ball, a jury could find that Federal's decision to deny coverage in September 2014 was without a reasonable basis.

## II. Knowledge of Lack of Reasonable Basis

For the first time in its reply brief, Federal argues that it is entitled to summary judgment because Ball "outright ignores the second element of a claim for bad faith handling of a workers' compensation claim, i.e. knowledge of the lack of a reasonable basis by the insurer." Docket 70 at 8. The Eighth Circuit Court of Appeals has stated that a party moving for summary judgment must inform the court of the basis for its motion. *Hartnagel*, 953 F.2d at 395. Nowhere in its memorandum of law in support of its motion for summary judgment (Docket 63) does Federal argue it is entitled to summary judgment on the basis that the nonmoving party has not presented evidence to support the second element of its bad faith claim. *See* Docket 63. The court was only informed of this alleged basis for relief in Federal's reply brief. This ensured that Ball did not have an opportunity to respond.

14

This court and the Eighth Circuit Court of Appeals have stated that the court is not required to address arguments made for the first time in a reply brief. *North Star Mut. Ins. Co. v. CNH Am. LLC*, No. 4:11-CV-04133-KES, 2013 WL 5156457, at \*7 (D.S.D. Sept. 12, 2013); *see also Bearden v. Lemon*, 475 F.3d 926, 930 (8th Cir. 2007); *Johnson v. Berry*, 171 F. Supp. 2d 985, 990 n.3 (E.D. Mo. 2001). Thus, the court declines to address Federal's motion for summary judgment based on Ball's alleged failure to provide evidence of the second element—knowledge of the lack of a reasonable basis—of his claim.

## CONCLUSION

Ball demonstrates that disputes of fact exist as to whether Federal had a reasonable basis to deny Ball's workers' compensation claim after September 2014. Thus, Federal has not met its burden of showing that it is entitled to judgment as a matter of law, and it is

ORDERED that Federal's motion for summary judgment (Docket 62) is denied.

DATED this 12th day of May, 2021.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

15